UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

American Association for Justice
a/k/a Association of Trial Lawyers
of America,

        Plaintiff,

v.                                       Civil No. 07-4626 (JNE/JJG)
                                           ORDER

The American Trial Lawyers Association
a/k/a The ATLA, and J. Keith Givens,

        Defendants.

---

Christopher K. Larus, Esq., and Kelly M. McLain, Esq., Robins Kaplan Miller & Ciresi LLP, appeared for Plaintiff.

Angela J. Mason, Esq., and J. Keith Givens, Esq., Cochran, Cherry, Givens, Smith, Lane & Taylor PC, and Marshall H. Tanick, Esq., Mansfield Tanick & Cohen, PA, appeared for Defendants.

---

In July 2006, members of the Association of Trial Lawyers of America voted to change the name of the organization to the American Association for Justice (AAJ). The name change took effect in December 2006. In March 2007, J. Keith Givens (Keith Givens), a long-time AAJ member, reserved the corporate name The American Trial Lawyers Association, Inc. (Association). Articles of incorporation were filed and signed by his two college-aged sons less than a week later. The Association first sent solicitation letters to prospective members in June 2007. Additional solicitation letters followed in November 2007. AAJ filed this trademark infringement action soon thereafter. Before the Court are AAJ's Motion for Partial Summary Judgment on Defendants' Affirmative Defense of Abandonment and the Association's and Keith Givens's (collectively, Defendants) Motions for Summary Judgment. For the reasons discussed below, the Court grants AAJ's motion and denies the Association's and Keith Givens's motions.

# I.    BACKGROUND

*A.    American Association for Justice*

AAJ is "the world's largest trial bar with members throughout the United States."

"Regular members" of AAJ must be "actively engaged in the practice of law in any field or

phase of advocacy" and "for the most part, based on caseload and time, represent[] the plaintiff

in civil litigation or represent[] the defendant in criminal litigation."  AAJ's stated mission is to:

> Seek justice for all; preserve the constitutional right to trial by jury; prevent injury
> from occurring; champion the cause of those who deserve redress for injury to
> person or property; promote the public good through concerted efforts to secure
> safe products, a safe workplace, a clean environment, and quality health care;
> further the rule of law and the civil justice system, and protect the rights of the
> accused; inspire excellence in advocacy through training and education;
> encourage cooperation among members; advance the common law and the finest
> traditions of jurisprudence; uphold the honor and dignity of the legal profession
> and the highest standards of ethical conduct and integrity.

To further this mission, AAJ provides certain products and services, including AAJ

memberships, continuing legal education (CLE) seminars and conferences, magazines, and legal

publications.  One such product is TRIAL magazine, "AAJ's monthly flagship magazine for 45

years [that] has a nationwide readership of civil plaintiff attorneys."  AAJ also engages in "public

service initiatives" such as "lobbying and other communications with state and federal

legislatures and . . . the press."

AAJ was formed in 1946 under the corporate name National Association of

Compensation Attorneys.[1]  After changing its name twice, AAJ became known as the American

Trial Lawyers Association in 1964.  In response to a trademark infringement action brought by

the American College of Trial Lawyers, AAJ changed its name in 1973 to the Association of

---

[1]    There is inconsistency in the record as to whether AAJ was known as the National
Association of Compensation Attorneys or the National Association of Claimants' Compensation
Attorneys in 1946.

Trial Lawyers of America.  Three years later, AAJ registered the mark "ATLA" with the United States Patent and Trademark Office (USPTO).

In 2005, to counteract the perceived derogation of the term "trial attorney," AAJ's executive committee, headed by chief executive officer, Jon Haber, began to consider changing AAJ's corporate name to highlight the organization's mission rather than its membership.  After submitting various options to consumer testing, the executive committee settled on the "American Association for Justice" as the proposed new name.  In response to significant opposition from members, Haber, Ken Suggs (AAJ's president from July 2005 to July 2006), and others conducted a concerted lobbying effort to promote the name change, including drafting talking points, expanding a presentation, polling, checking for conflicts, contacting the state associations, presenting data nationwide, answering list serves, and talking individually to numerous members.  The effort was successful.  The executive committee first obtained the required approval from the Board of Governors in June 2006.  At the annual convention the following month, seventy-nine percent of the voting members in attendance voted in favor of the name change.[2]

After AAJ's membership voted to change the organization's name, members and staff were instructed to continue using ATLA for identification purposes until the name change officially took effect.  The logistics of transitioning to the new name required development of a new logo, slogan, and style guide, as well as an inventory of all of the ATLA publications and communications.  By September 30, 2006, Haber estimated that the name change would occur in mid-December.  Haber noted, however, that the change would be a "'soft launch' rather than . . .

---

[2]     AAJ's bylaws required two-thirds of voting members in attendance at the meeting to vote in favor of the name change.

a 'hard launch.'  For example, due to printing deadlines, there will be a transition period during which certain publications and materials will continue to bear the ATLA name."  The name change officially occurred on December 11, 2006.  A new website—www.justice.org—was launched on that date and AAJ formatted the old websites—www.atla.org and www.atlanet.org—to automatically redirect users to the new website for a minimum of six months.  Although a "universal find-and-replace for 'ATLA' and 'Association of Trial Lawyers of America' ha[d] been performed on the [new website]," Haber asked staff to "help in catching any inconsistencies."  All internal documents were updated, including leave forms, fax cover sheets, stationery, and memo templates.  New AAJ letterhead and business cards were made available, and the member services booth for AAJ's January 2007 annual conference was remodeled "to reflect [the] new name" and ensure "ATLA [would not] appear anywhere on [the] booth."  Haber indicated in a memorandum to all AAJ staff that "[b]y necessity, the names of our various entities and subsets will be changed."  Haber identified the following changes: "Friends of ATLA = Friends of Justice; ATLA Leaders Forum = AAJ Leaders Forum; ATLA PAC = TBD; ATLA Extras = Extras; ATLA Education = Education; ATLA Press = AAJ Press."

Despite the official name change, AAJ continued to use the Association of Trial Lawyers of America or ATLA marks in the following contexts:

- AAJ's new website continuously displayed the language "Formerly the Association of Trial Lawyers of America."

- Beginning as early as January 2007, AAJ identified itself in advertisements and seminar solicitations as "American Association for Justice Formerly the Association of Trial Lawyers of America."

- Some AAJ staff members were using the "formerly" language in their signature blocks in e-mails as early as March 2007.

- On June 7, 2007, AAJ sent 51,645 solicitation letters to lapsed members.[3]  The letters identified AAJ as "formerly the Association of Trial Lawyers of America (ATLA®)."  In addition, the outside of the mailing envelope and the return envelope displayed circular seals.  The seals consisted of two concentric circles with the ATLA mark displayed in front of the scales of justice inside the inner circle and the Association of Trial Lawyers of America inscribed in the space between the inner and outer circles.[4]

- AAJ continued to license its ATLA mark after December 2006, and at least one third-party licensee continuously used the mark.

- A book first published in 2007 titled "Negotiating and Settling Tort Cases" indicated on its spine, front cover, and inside title page that it was published by "ATLA Press" through Thomson West.  Sales of the book from April 2007 until the end of March 2009 totaled $33,857.49.

- AAJ continued to sell books incorporating ATLA in the title throughout 2007, including "ATLA's Litigating Tort Cases," "ATLA's Trial Notebook," and "ATLA's Deposition Notebook."  These titles generated over $119,000 in revenue in 2007, including $14,000 in the first quarter.

---

[3]     Between March 1, 2006, and February 28, 2007, 13,381 of AAJ's 50,027 members had dropped or cancelled their membership.

[4]     Defendants challenge the reliability of the June 7, 2007, mailing date.  A May 1, 2007, e-mail indicates that AAJ decided to "predominantly have ATLA mentioned" in a "marketing acquisition piece to . . . lapsed members . . . so that the potential member has a clear understanding of who is sending them the mail piece."  AAJ submitted the affidavit of Anjali Jesseramsing, an AAJ employee since 1996 who became the senior vice president of products and services for AAJ in November 2008, to support the June 7 date.  Jesseramsing's affidavit asserts that AAJ sent a series of three solicitation letters to lapsed members in 2007.  The first letter, sent in January or February 2007, did not display the ATLA seal.  The June 7 mailing was a follow-up to lapsed members who did not respond to the first mailing.  Defendants argue that AAJ has presented "no independent confirmation of th[e] purported [June 7] date."  However, on the outside of the envelope of one letter that was returned as undeliverable, a handwritten note states "[l]apsed member prospects, 2nd mail 6/7/07."  The handwritten note and Jesseramsing's affidavit are reliable evidence that the AAJ lapsed-member letters displaying the ATLA and the Association of Trial Lawyers of America marks were mailed on June 7, 2007.  The only evidence produced by Defendants challenging this date is an e-mail from Kevin Mills, AAJ's director of member relations, to Haber on June 25, 2007, indicating that he was "planning to include the ATLA logo along with the AAJ logo on future mailings," but that it was "too late and would be too costly to include in this mailing."  Read in context, however, it is clear that Mills was referring to "State follow up letters," not the "lapsed member letter."  Accordingly, the Court finds that the June 7, 2007, mailing date is supported by undisputed evidence.

- Since December 2006, the websites www.atla.org and www.atlanet.org have continuously directed users to the new website www.justice.org.  Between October 1, 2008, and May 15, 2008, users were redirected from the web addresses incorporating the ATLA mark to the new website 1,496 times.

- A promotional video produced in 2006 was reproduced after the name change to refer to the American Association for Justice.  The reproduced video, which was used to recruit new members until December 2008, displays both "ATLA" and the "American Association for Justice."  The video was aired at various seminars in February, March, April, and May 2007.

In a September 3, 2007, e-mail to all AAJ staff, Haber indicated that "we continue to use the phrase 'Formerly the Association of Trial Lawyers of America' in many places.  We will continue to do that for some time as many of our members still know us by the old name as it will take them some time to get used to the new one."  Haber further noted that "when you use the old name, it's important to include the acronym 'ATLA' as well."  The following day, Haber sent another e-mail telling all staff members to use the "registered trademark symbol (circle R) after 'ATLA.'"

B.      *The American Trial Lawyers Association*

On January 29, 2007, Keith Givens sent an e-mail to Jerome Tew, an employee of Keith Givens's law firm, asking Tew to "reserve" the following domain names in Keith Givens's name: Americantriallawyerassociation.com; Americantriallawyersassoc.com; americantriallawyerassoc.com; americantriallawyersassociation.com; and Americantriallawyer.com.  Tew responded that he successfully registered the first three domain names.  Keith Givens then asked Tew to check on the availability of TheAmericanTrialLawyer.com and TheAmericanTrialLawyersAssociation.com.  On February 1, 2007, Tew registered theamericantriallawyerassoc.com, theamericantriallawyerassociation.com, theamericantriallawyersassoc.com, theamericantriallawyersassociation.com, and theatla.com.

Over the next three months, several additional similar domain names were registered with John Givens, the elder son of Keith Givens, and "The ATLA" named as the registrants.[5]

Keith Givens reserved the corporate name The American Trial Lawyers Association, Inc., with the Alabama Secretary of State on March 7, 2007.  The official name reservation document provided that the name was "for the exclusive use of Keith Givens."  The articles of incorporation for the Association were filed and signed on March 13, 2007, by John Givens and his brother Chase Givens.  The stated purpose of the Association was "to provide a professional association, educational and business organization for attorneys who practice law and for individuals and organizations that have an interest in the law or trial work, broadly defined, to include civil, domestic and criminal defense law."  John and Chase Givens were listed as the only two members of the Association's initial board of directors, and Keith Givens was named as the Association's initial registered agent.  John and Chase Givens were named president and vice-president of the Association, respectively.

Keith Givens filed applications to register three trademarks with the USPTO on March 20, 2007.  The first application, 77135676, was for a mark with a golden image of Lady Justice in front of two thin concentric blue circles.  "The American Trial Lawyers Association" appeared directly adjacent to Lady Justice in blue text.  The second application, 77135471, sought to register a mark consisting of two concentric circles.  The space between the outer and inner circles was blue and contained the text "The American Trial Lawyers Association."  The inner circle was gold.  Lady Justice was displayed in the background of the inner circle and the words "The ATLA" appeared in the foreground.  The gold text "The American Trial Lawyers

---

[5]      The domain name registrations from April 2007 list only John Givens as the registrant. The record also contains evidence of at least one domain name that was registered to John Givens and "The ATLA" in December 2006, and at least one other registered to John Givens in November 2007.

Association" appeared alongside the concentric circles.  The third application, 77135190, was for a mark that differed from the second mark only in its use of blue and gold.[6]

The Association used spare offices and equipment in a building associated with Keith Givens's law firm.  In addition, Keith Givens, directly or through the companies or law firms he was associated with, financed all of the Association's initial activities.  Michelle Swanner, the wife of one of Keith Givens's law partners, agreed to work for the Association.  Her title later became executive director.[7]

John and Chase Givens worked at the Association developing the website during the summer of 2007.  On June 20, 2007, the Association sent membership solicitation letters to the "Top 100 Trial Lawyers" from select states.  The letters, which were signed by Swanner, referred to the Association as "TheATLA," prominently displayed the second mark filed with the USPTO, identified the Association's website as www.TheATLA.com, and advertised the Association's telephone number as 1-866-665-ATLA.  The solicitation letters also indicated that:

> [T]he purpose of TheATLA is to offer practical educational programs, networking opportunities and legal publications that deal with current issues facing Trial Lawyers.
>
> Membership into TheATLA is by invitation and is extended only to those attorneys who exemplify superior qualifications, trial results, leadership, influence, reputation, stature, and profile in the trial attorney community, as viewed by TheATLA, other trial lawyers, members of the bench, and the public at large.

---

[6]     The first application was approved for publication as a mark to be registered on December 29, 2007, and published for opposition on March 11, 2008.  The mark has not been registered because of an opposition filed by the American College of Trial Lawyers.  The USPTO suspended the application for the second mark in part due to this lawsuit.  The third mark was not approved and has been abandoned as a duplicate of the second mark.

[7]     In addition to the domain names mentioned earlier that were registered to John Givens and the Association, the domain name theatlatravel.com was registered to Swanner on an unspecified date.

C.      *The controversy*

AAJ members who received the Association's solicitation letter notified AAJ leadership. Upon notification of the Association's existence, Gibson Vance, AAJ's vice president, formed a belief that the Association was infringing the ATLA and the Association of Trial Lawyers of America marks.  Vance spoke with Keith Givens to obtain information regarding the Association, to tell Keith Givens that he thought the Association was infringing on AAJ's marks, and to have Keith Givens cease such infringement.  In response to that conversation, which focused solely on the Association's use of TheATLA, Keith Givens agreed to temporarily refrain from sending additional solicitation letters.  In a later conversation, however, Keith Givens informed Vance that the Association would not change its website or its vanity telephone number.

The Association mailed additional membership solicitation letters bearing Swanner's signature on November 7, 2007.[8]  The second letter contained the first mark filed with the USPTO, which did not contain the text "The ATLA."  The body of the letter continued to refer to the Association as TheATLA but contained a footnote indicating that the Association was "not affiliated in any way with [AAJ] or the American College of Trial Lawyers."  The letter continued to use the vanity telephone number and refer prospective members to the Association's website at www.TheATLA.com.

Counsel for AAJ sent Keith Givens and Swanner a letter on November 19, 2007, requesting that the Association "immediately cease and desist from all use of the terms THE ATLA, THEATLA, or any other colorable imitation of the ATLA® mark."  Enclosed with the letter was a copy of the Complaint that had been filed four days earlier.  The Complaint alleged

---

[8]      Later mailings were also signed by Keith Givens.

federal and state trademark claims against the Association and Keith Givens arising out of their alleged infringement of the ATLA mark.  Keith Givens responded on behalf of the Association in a December 17, 2007, letter in which the Association agreed to "suspend use of the terms 'The ATLA' or 'TheATLA', on its website, mail outs and all other marketing material."  The letter noted, however, that three "items need to remain in use until replaced or supplies are exhausted."  Those items were: "(1) The URL 'Theatla.com'; (2) The toll free number '1-866-655-ATLA'; and (3) the gold seal used on membership certificates."

On January 4, 2008, Keith Givens, on behalf of U.S. Legal, P.C., incorporated The American Trial Lawyer, Inc. (ATLI).  The articles of incorporation named Keith Givens and Michael Papantonio as the only members of the board of directors.  The stated purpose of the corporation was "to provide a magazine/journal providing progressive and educational news, information, and articles relevant to civil plaintiff and criminal defense trial lawyers."  Keith Givens was a ninety-percent shareholder and Swanner was a ten-percent shareholder in the corporation.  ATLI published its first issue of "The American Trial Lawyer" magazine in fall 2008.  Members of the Association receive the magazine automatically and it is available for purchase by nonmembers.  The magazine has been advertised as the Association's "official magazine."

AAJ filed a Second Amended Complaint on December 5, 2008,[9] adding allegations based on the Association of Trial Lawyers of America mark, Defendants' registration, maintenance, and use of thirty-five internet domain names, and the publication and distribution of The American Trial Lawyer magazine.  The Second Amended Complaint asserts claims for trademark infringement pursuant to the Lanham Act §§ 32 and 43(a), 15 U.S.C. §§ 1114 and

---

[9]     An Amended Complaint was filed on January 11, 2008.

1125(a) (2006),[10] a claim under the Anticybersquatting Consumer Protection Act (ACPA), 15

U.S.C. § 1125(d), and state trademark infringement claims.[11]   Now before the Court are AAJ's

Motion for Partial Summary Judgment on Defendants' Affirmative Defense of Abandonment

and Defendants' Motions for Summary Judgment.[12]

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant "bears

the initial responsibility of informing the district court of the basis for its motion," and must

identify "those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant

satisfies its burden, the party opposing the motion must respond by submitting evidentiary

materials that "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2);

*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining

---

[10]     Count I of the Second Amended Complaint does not identify the statutory basis for the claim.  The allegations, however, refer to the federally registered ATLA mark, and the Court presumes that Count I arises under § 1114.

[11]     The parties agree that the relevant state and federal laws are coterminous.  *See DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003).  Therefore, the Court refers only to federal law.

[12]     Keith Givens adopted the arguments in support of the Association's motion in addition to arguing that he cannot be held individually liable for the alleged trademark infringement or the alleged ACPA violations.  The record, however, contains substantial evidence of Keith Givens's direct participation in the alleged infringing activities.  *See United States v. Washington Mint, L.L.C.*, 115 F. Supp. 2d 1089, 1106 (D. Minn. 2000) (noting individual may be liable for trademark infringement "if he or she directly participates in the infringement"); *see also David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir. 1989) ("Every person actively partaking in, lending aid to, or ratifying and adopting [trademark infringing] acts is liable equally with the party performing these acts.").  Therefore, the Court denies Keith Givens's motion to the extent he argues that he was not a direct participant in the alleged infringing activities.

whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.     *Defenses*

    *1.     Abandonment*

The parties have all moved for summary judgment on Defendants' affirmative defense of abandonment. If a mark has been abandoned, it "falls into the public domain and is free for all to use." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002) (quotation marks omitted). A mark is abandoned "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127 (2006). "'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *Id.* Use of a mark to identify and distinguish a product from other products and to identify source is the *sine qua non* of a bona fide use. *See Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 101 (5th Cir. 1983) (finding "arranged sales in which the mark was not allowed to play its basic role of identifying source were not 'use'" under § 1127); *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.1 (4th ed. 2009) (noting that trademark rights are "obtained by actual use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others"). "[N]either promotional use of [a] mark on goods in a different course of trade nor mere token use constitute 'use' under the Lanham Act." *Emergency One, Inc. v. Am. Fireeagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). However, a prospective intent to abandon a mark does not establish abandonment. *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 937 (9th Cir. 2006). Rather, "abandonment requires *complete* cessation or discontinuance of trademark

use." *Id.* at 938.  A single bona fide use of a mark "'is sufficient against a claim of

abandonment.'" *Id.* (quoting *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 804

(9th Cir. 1970)).  If use of the trademark is not actually discontinued, "the intent not to resume

use prong of abandonment does not come into play." *Id.* at 937-38.  Because abandonment

constitutes a forfeiture of a property right, it "must be strictly proved" by the party seeking

abandonment.[13]  *See Iowa Health Sys., Inc. v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 918

(N.D. Iowa 2001) (quotation marks omitted).

Defendants contend that the undisputed evidence shows that AAJ discontinued the bona

fide use of the ATLA and the Association of Trial Lawyers of America marks without intending

to resume their use.  AAJ argues that the undisputed evidence establishes that AAJ was using the

ATLA and the Association of Trial Lawyers of America marks at the time of Defendants' first

use of the alleged infringing marks in the ordinary course of trade on June 20, 2007.[14]  The Court

agrees with AAJ.

Beginning immediately after the official name change in December 2006, AAJ identified

itself as "formerly the Association of Trial Lawyers of America" on its website, in

advertisements, and in the e-mail signature blocks of some AAJ staff.  In addition, beginning

---

[13]      The law is unsettled with respect to whether "strict proof" requires proof by clear and
convincing evidence or merely a preponderance of the evidence.  *See, e.g.*, *Grocery Outlet, Inc.
v. Albertson's Inc.*, 497 F.3d 949, 952-54 (9th Cir. 2007) (concurring judges reaching different
conclusions on burden of proof).  The Court, however, need not address this issue because, as
discussed below, the undisputed facts establish under either standard that AAJ did not abandon
its marks.

[14]      Defendants, without legal support, also maintain that they "used the mark in the ordinary
course of trade [before June 20, 2007, by] establishing a business and a website, setting up
offices, obtaining letterhead, seals, membership certificates, etc."  This argument directly
contradicts the "traditional rule . . . that use of a symbol in steps preliminary to establishing a
business does not establish a priority date or a use sufficient for federal registration."  *See* 2 J.
Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.12 (4th ed. 2009).
Accordingly, the Court rejects Defendants' argument.

with mailings to prospective members on June 7, 2007, AAJ identified itself as "formerly the Association of Trial Lawyers of America (ATLA®)," and included a seal containing both marks on the mailing and return envelopes.  Such use of the designation "formerly" to capitalize on the goodwill and source identification of the marks constitutes bona fide use.  *Cf. First Fed. Sav. & Loan Ass'n of Council Bluffs v. First Fed. Sav. and Loan Ass'n of Lincoln*, 929 F.2d 382, 385 (8th Cir. 1991) ("The new savings and loan plans to capitalize on First Federal Council Bluffs' good name by advertising itself as the 'former First Federal.'  This [may] support a continuation of the injunction [prohibiting the defendant's use of First Federal] for as long as the identification with the former institution is used by the new owners."); *Alliant Energy Corp. v. Alltel Corp.*, 344 F. Supp. 2d 1176, 1187 (S.D. Iowa 2004) ("Despite a name change, a trademark may still possess significant goodwill and remain a valuable asset to a company. . . . Even in cases such as the present one, where there are extensive efforts to notify the public of the name change, there is still the possibility that goodwill remains in the marks.").  Accordingly, summary judgment in favor of AAJ on the issue of abandonment is warranted based on this evidence alone.

Moreover, additional undisputed evidence establishes continued bona fide use of the marks by AAJ.  First, after the December 2006 name change, AAJ continued to license the ATLA mark to at least one licensee who has continuously used the mark.  *Cf. Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("Use of a trademark need not always be made directly by the trademark owner and is often made with the permission of the owner via a licensing agreement."); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.45.50 (4th ed. 2009) ("A licensee's use inures to the benefit of the licensor-owner of the mark.").  Second, at least one publication continued to be published by "ATLA

Press," and three other publications incorporating "ATLA" into their titles continued to be

published.[15]  Sales of these publications generated substantial revenue.  Third, AAJ maintained

the www.atla.org and www.atlanet.org websites to direct users to the organization's new

website.  Similar to the "formerly" designation, such use, even if intended to be temporary,

capitalized on the source identification and goodwill of the ATLA mark by directing those

individuals who were drawn to the website by the ATLA mark to the new AAJ website.  Fourth,

AAJ used a promotional video until December 2008 that displayed the ATLA mark.  In isolation,

the limited use of the promotional video would likely not be a bona fide use.  Considered

together with the other uses, however, the promotional video reinforces AAJ's continued bona

fide use of the mark.  Because the undisputed evidence establishes AAJ's continuous bona fide

use of the ATLA and the Association of Trial Lawyers of America marks, summary judgment in

favor of AAJ and against Defendants is warranted on Defendants' affirmative defense of

abandonment.

> 2.    *Equitable estoppel*

Defendants next argue that AAJ should be estopped from bringing this action because

they relied to their detriment on a variety of statements and omissions made by AAJ and its

representatives.  To prevail on an estoppel defense, Defendants must show that "(1) they were

misled by [AAJ's] conduct to believe that [AAJ] did not intend to enforce its trademark against

---

[15]    The evidence indicates that AAJ intended to change "ATLA Press" to "AAJ Press" and to replace "ATLA" with "AAJ" in the titles of the three publications.  The changes, however, apparently never occurred because AAJ and the publisher could not agree on a new publication contract.  Instead, the publications will continue to be published using the ATLA mark.  This does not present the typical vestigial use scenario in which the selling of old inventory has been held to not constitute bona fide use.  *See, e.g.*, *Del-Rain Corp. v. Pelonis USA, Ltd.*, 29 F. App'x 35, 38 (2d Cir. 2002) ("An effort to dispose of the remaining stock of an abandoned line of merchandise does not constitute a bona fide use in the ordinary course of trade that suffices to defeat a finding of abandonment." (internal citations and quotation marks omitted)).

[them], (2) that [D]efendants [reasonably] relied on that conduct, and (3) that [D]efendants will be materially prejudiced if [AAJ] is permitted to enforce its trademark rights." *Minn. Mining & Mfg. Co. v. Beautone Specialties, Co.*, 82 F. Supp. 2d 997, 1005 (D. Minn. 2000); *see also Reed v. Lear Corp.*, 556 F.3d 674, 678 (8th Cir. 2009) ("The principle of equitable estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." (quotation marks omitted)).  Silence or inaction may constitute misleading conduct if it is "combined with other facts surrounding the relationship or contacts between the parties to support an inference that the claim against the alleged infringer has been abandoned." *Minn. Mining*, 82 F. Supp. 2d at 1005-06.

Defendants argue that they were misled by the following alleged conduct or omissions: (1) AAJ's communications about the name change that were sent to AAJ members, including Keith Givens; (2) a conversation that Keith Givens had with Suggs in November or December 2006 in which Suggs indicated that AAJ did not intend to continue use of the ATLA mark, and another conversation in February 2007 in which Keith Givens told Suggs about the Association and Suggs expressed no concerns about the Association's name; (3) Vance told Keith Givens that AAJ was only concerned with the Association's use of TheATLA, and the cease-and-desist letter and Complaint challenged only the Association's use of TheATLA; and (4) AAJ's "failure to object" to the Association's trademark applications.[16]  As discussed below, material fact issues

---

[16]     Defendants do not distinguish the March 2007 trademark applications in making this argument.  AAJ disputed the second mark's use of The ATLA by bringing this action in November 2007.  The third mark was abandoned.  As a result, the Court finds that this argument applies solely to the first application.

remain as to whether AAJ engaged in misleading conduct and whether Defendants relied on that conduct.

First, Defendants have identified no specific communications supposedly relied on by Keith Givens.  Without this information, the Court cannot assess whether AAJ engaged in misleading conduct or whether Keith Givens reasonably relied on those statements.

Second, Suggs denies telling Keith Givens in November or December 2006 that AAJ intended to abandon the ATLA and the Association of Trial Lawyers of America marks. Moreover, Suggs maintains that he was not acting in his capacity as the former president of AAJ during any conversations with Keith Givens related to the Association.  Accordingly, a fact issue remains as to whether Suggs had reason to believe that Keith Givens would rely upon Suggs's statements or omissions.  *See Bostwick Irrigation Dist. v. United States*, 900 F.2d 1285, 1291 (8th Cir. 1990) ("[B]efore an estoppel arises a party must make a misrepresentation or take an action with reason to believe that the other party will rely upon it.").

Third, Vance denies telling Keith Givens that he had no objection to the use of The American Trial Lawyers Association.  Moreover, whether AAJ's failure to expressly challenge the Association's use of The American Trial Lawyers Association in the cease-and-desist letter and the Complaint constituted misleading conduct that was reasonably relied on by Defendants must be decided by the fact finder.

Fourth, an opposition to a trademark registration may be filed only after publication of the mark.  *See* 15 U.S.C. § 1063(a) (2006).  A petition to cancel a registration may be made within five years from the date of a mark's registration.  *Id.* § 1064(1).  Although AAJ filed no formal opposition to the first mark, AAJ amended the Complaint in this action to challenge Defendants' use of The Association of Trial Lawyers of America less than eight months after

publication of the mark for opposition.  Whether AAJ's failure to immediately object to the mark was misleading conduct reasonably relied on by Defendants presents a disputed fact question. Accordingly, summary judgment on Defendants' affirmative defense of equitable estoppel is not warranted.

B.      *Trademark infringement*

Defendants next contend that the undisputed facts require summary judgment on AAJ's trademark infringement claims.  A plaintiff establishes a claim for trademark infringement by proving that it has a valid, protectable mark "and that there is a likelihood of confusion between its mark and the defendant's mark."  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009); *see also Eniva Corp. v. Global Water Solutions, Inc.*, 440 F. Supp. 2d 1042, 1049 n.3 (D. Minn. 2006) (noting that claims under § 32 and § 43(a) of the Lanham Act "are measured by identical 'likely to cause confusion' standards").

1.      *Valid mark in the Association of Trial Lawyers of America*

Defendants do not challenge the validity of the federally registered ATLA mark.[17] Defendants, however, argue that AAJ has no valid and protectable common law mark in the Association of Trial Lawyers of America.

---

[17]      Defendants do assert, without citation to legal authority, that AAJ has waived its right to claim trademark infringement based on the ATLA mark because it refused the Association's offer to stop using TheATLA.  It is undisputed, however, that the Association continues to use the website www.TheATLA.com and the vanity telephone number incorporating the ATLA mark.  Moreover, no evidence indicates that AAJ intentionally relinquished its right to pursue this action for infringement of the ATLA mark.  *See, e.g.*, *Haghighi v. Russian-Am. Broad. Co.*, 173 F.3d 1086, 1088 (8th Cir. 1999) ("Waiver requires evidence of a voluntary and intentional relinquishment or abandonment of a known right.").  Indeed, the evidence shows that AAJ has consistently acted to prevent the Association from using the ATLA mark or any colorable imitation since AAJ learned of the Association's June 2007 membership solicitation letters. Defendants further argue, again with no citation to legal authority, that AAJ's claims based on the ATLA mark are moot because the Association only uses ATLA in its domain name and vanity telephone number.  Such use, however, can support a trademark infringement claim.  *See,*

### a.      Categorization of mark

A mark is entitled to trademark protection if it is distinctive.  *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006).  To determine whether a mark is distinctive, it is categorized as either "generic, descriptive, suggestive, or arbitrary."  *Id.*  "A generic term can never function as a trademark because it refers to the common name or nature of the article."  *Id.*  Similarly, a descriptive mark is ordinarily not protectable because it "conveys an immediate idea of the ingredients, qualities or characteristics of the goods . . . ."  *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005) (quotation marks omitted).  A descriptive mark becomes distinctive only upon acquiring secondary meaning.  *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985).  "Suggestive marks, which require imagination to reach a conclusion as to the nature of the goods, and arbitrary . . . marks, which are inherently distinctive, are entitled to immediate protection, without establishing secondary meaning."  *Id.*  The contours of the line dividing suggestive from descriptive marks cannot be precisely defined.  *See, e.g.*, *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 763 (6th Cir. 2005).  Rather, the line's "exact location in any given situation is hazy and only subjectively definable.  The descriptive category almost imperceptibly shades over at its fringe into the suggestive domain."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.66 (4th ed. 2009).

---

*e.g.*, *DaimlerChrysler*, 315 F.3d at 939 (noting that a mark holder may be entitled to relief if "the defendant advertises or otherwise promotes the alphanumeric translation of the phone number thereby causing the public to see the protected mark and associate the infringer's goods or services with those of the mark holder"); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.1 (4th ed. 2009) ("When a domain name is used for a web site that advertises or offers for sale any goods or services, the Lanham Act [is] triggered."). Furthermore, the cessation of infringing activities does not redeem the earlier infringement.  *Cf. Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1052-58 (8th Cir. 2005) (addressing trademark infringement claim despite cessation of infringing activities during litigation).

AAJ argues that the Association of Trial Lawyers of America mark is suggestive rather than descriptive because it "does not immediately convey the broad range of goods and services offered by [AAJ] under the mark." A mark, however, "'need not recite each feature of the relevant goods or services in detail to be descriptive.'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1201 (9th Cir. 2009) (quoting *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346 (Fed. Cir. 2001)). Instead, the "inquiry is whether, when the mark is seen on the goods or services, it immediately conveys information about their nature." *Id.* (quotation marks omitted). Thus, the Association of Trial Lawyers of America mark is not suggestive merely because it does not identify the specific goods and services offered by AAJ under the mark. It is sufficient that the mark immediately conveys that the goods and services offered under the mark relate to trial attorneys. Accordingly, the Association of Trial Lawyers of America mark is descriptive and requires secondary meaning for trademark protection.

        *b.*      *Secondary meaning*

"Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product." *Frosty Treats*, 426 F.3d at 1005 (quotation marks omitted). The consuming public need not "identify a source by name," but must "recognize the mark and associate it with a single source." *Id.* Secondary meaning can be established by "direct evidence such as consumer testimony or surveys." *Id.* In addition, circumstantial evidence can support a finding of secondary meaning. *Id.* Relevant circumstantial evidence includes "the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying." *Id.* at 1005-06. "Evidence of actual confusion

also is relevant to determining whether secondary meaning has been established." *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 645 F. Supp. 2d 734, 760 (D. Minn. 2009).

Here, there is evidence of actual consumer confusion between the Association's marks and the Association of Trial Lawyers of America mark.  For example, one attorney who received a solicitation letter from the Association later requested a refund because "[i]n June, 2007 [he] forwarded a check . . . to The ATLA (The American Trial Lawyers Association) for membership dues.  [He] thought [he] was sending membership dues to ATLA (Association of Trial Lawyers of America) because [the Association's] name and logo appear to be almost identical."  Similarly, another attorney who received a solicitation letter from the Association stated that "[b]ecause of the obvious similarity of the terms 'The American Trial Lawyers' Association' and 'The ATLA' to the terms Association of Trial Lawyers of America and ATLA, I mistakenly believed that this solicitation had been sent by the organization I know as ATLA and the Association of Trial Lawyers of America."  In reliance on this mistaken belief, the attorney paid the membership fee and inadvertently became a member of the Association.  In addition to these two specific instances of confusion, the record contains several additional examples of individuals mistaking the Association for AAJ.  Furthermore, AAJ submitted survey evidence supporting a finding of consumer confusion between The American Trial Lawyers Association mark and the Association of Trial Lawyers of America mark.[18]

---

[18]     Defendants indicate that they will challenge the expert report in a motion in limine.  They have not, however, challenged the report for purposes of this motion.  The Court reminds Defendants that "[i]n the Eighth Circuit, consumer confusion surveys are not generally excluded due to flaws in the survey.  Rather, technical flaws in consumer confusion studies should bear on the weight accorded them, not on their admissibility."  *Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, L.P.*, Civ. No. 00-2317, 2002 U.S. Dist. LEXIS 13991, at *7 (D. Minn. July 26, 2002) (citations omitted).

The evidence further supports a finding that Defendants copied the Association of Trial Lawyers of America mark. Keith Givens was a long-time member of AAJ and was familiar with the mark. The American Trial Lawyers Association mark is phonetically similar to the Association of Trial Lawyers of America mark and results in the same acronym. In addition, Defendants' applications with the USPTO contained seals that were nearly identical to the seals used by AAJ that incorporated the Association of Trial Lawyers of America mark.

Furthermore, AAJ extensively used the Association of Trial Lawyers of America mark in commerce beginning in 1973. During that time, AAJ apparently became the largest trial lawyer organization in the world and sent out hundreds of thousands of marketing pieces and solicitation letters using the Association of Trial Lawyers of America mark. The mark was also used in numerous written publications. In short, the direct evidence of actual consumer confusion, the evidence of copying, and AAJ's status, history, and use of the Association of Trial Lawyers of America mark create a fact issue as to whether the mark has become distinctive by acquiring secondary meaning.

### 2.   *Likelihood of confusion*

A court considers six factors to determine whether there is a likelihood of confusion:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's and defendant's marks; (3) the degree to which the allegedly infringing product competes with the plaintiff's goods; (4) the alleged infringer's intent to confuse the public; (5) the degree of care reasonably expected of potential customers; and (6) evidence of actual confusion.

*Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005) (citing *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). These factors guide a court's analysis, "but the ultimate determination of whether confusion is likely is not to be mechanically determined through rigid application of the factors." *Kemp*, 398 F.3d at 1054. "[T]he test of likelihood of confusion

encompasses any type of confusion, including confusion as to origin, source, sponsorship, affiliation, or connection." *Eniva Corp.*, 440 F. Supp. 2d at 1049; *see also* 15 U.S.C. § 1125(a)(1)(A).

Defendants argue that no evidence supports a likelihood of confusion between the following marks: ATLA and The American Trial Lawyers Association; ATLA and The American Trial Lawyer magazine; and the Association of Trial Lawyers of America and The American Trial Lawyer magazine. Although Defendants attempt to separate the ATLA mark from the Association of Trial Lawyers of America mark, the evidence supports a finding that the relevant consumers do not distinguish between the marks for purposes of ascertaining their origin, source, sponsorship, affiliation, or connection. In other words, the evidence indicates that the two AAJ marks are interchangeable in the minds of consumers. Specifically, the above quotations from the attorneys who were actually confused by the Association's solicitation letters refer to the ATLA mark and the Association of Trial Lawyers of America mark to identify the same organization. Similarly, AAJ's expert found that "many of the study participants who clearly associated the term The ATLA with the entity [AAJ] also mistakenly believed that entity utilized the name The American Trial Lawyers Association." As such, it would be improper at this stage of the proceedings to isolate the ATLA mark from the Association of Trial Lawyers of America mark in assessing whether there is a likelihood of confusion. *Cf. G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 994 (7th Cir. 1989) (noting in different context that "initials do not usually differ significantly in their trademark role from the descriptive words that they represent"). Instead, the Court's inquiry is whether there is evidence indicating that either of the AAJ marks is likely to be confused with The American Trial Lawyers Association mark or The American Trial Lawyer mark.

The patent similarity of the Association of Trial Lawyers of America and The American Trial Lawyers Association as well as the earlier discussed evidence of actual confusion, copying, and the strength of the mark obviate the need for a detailed analysis of the likelihood that the consuming public would confuse the two marks.  Suffice it to say, a fact issue remains regarding likelihood of confusion.  Furthermore, The American Trial Lawyer magazine is the "official magazine" of the Association and is marketed in conjunction with reference to The American Trial Lawyers Association mark.  Based on this close association between those two marks, the Court determines that a fact issue also remains as to whether there is a likelihood of confusion between the Association of Trial Lawyers of America mark and The American Trial Lawyer mark.[19]  *Cf. Kemp*, 398 F.3d at 1054 ("[C]omparison of the similarity between marks and products must occur in a context that recognizes how consumers encounter the products.").  Therefore, summary judgment in favor of Defendants on AAJ's trademark infringement claims is not warranted.

C.     *Anticybersquatting Consumer Protection Act*

The ACPA provides:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
>
> (i) has a bad faith intent to profit from that mark . . . ; and

---

[19]     Defendants, without legal support, assert that there can be no likelihood of confusion because "the magazine is a separate legal entity and not a defendant in this action."  This argument ignores the fact that there can be multiple trademark infringers.  As noted earlier, the only requirement is that a defendant directly participated in the infringing activity.  *See Washington Mint, L.L.C.*, 115 F. Supp. 2d at 1106; *see also David Berg*, 884 F.2d at 311.  Here, Keith Givens is one of two members of ATLI's board of directors, he is a ninety-percent shareholder in the company, and he directly participated in the alleged infringing use of The American Trial Lawyer mark.  Moreover, The American Trial Lawyer magazine's status as the "official magazine" of the Association supports a finding of direct participation by the Association in the alleged infringing activities.

> (ii) registers, traffics in, or uses a domain name that—
>
>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).

Defendants first argue that the ACPA is inapplicable because the undisputed facts show that they never registered, trafficked in, or used the contested domain names because the domain names are owned by John Givens or Swanner. This argument is meritless. First, many of the contested domain names are registered to John Givens and "The ATLA." Second, John Givens is the president of the Association and Swanner is the executive director. Their actions taken in those capacities are attributable to the Association. *See Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000) (noting that "a corporation can only act through its employees, directors and agents"); s*ee also Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1499 (10th Cir. 1994) (providing that a corporation "can only act through its officers and employees, and these acts are attributed to the corporation under basic principles of agency"). Third, several of the domain names were registered at the express direction of Keith Givens. Accordingly, the evidence shows that Defendants registered, trafficked in, or used the contested domain names.

Defendants further maintain that there is no evidence to support a finding that they had a bad faith intent to profit from the ATLA mark or the Association of Trial Lawyers of America mark. The ACPA provides a nonexclusive list of nine factors for a court's consideration in determining "whether a person has a bad faith intent." 15 U.S.C. § 1125(d)(1)(B). The first four factors identify "reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark." *Coca-Cola Co. v Purdy*, 382 F.3d 774, 785 (8th Cir. 2004).

None of those factors are present here.[20]  The remaining five factors "are indicia of bad faith

intent."  *Id.*  Three of the five factors are not present.[21]  Nevertheless, the evidence of

Defendants' knowledge of the ATLA and the Association of Trial Lawyers of America marks at

the time of registering the domain names supports an inference that Defendants intended to

divert consumers from AAJ's online location to the Association's website.  *See* 15 U.S.C.

---

[20]     Those factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the
domain name;

(II) the extent to which the domain name consists of the legal name of the person
or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the
bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site
accessible under the domain name.

15 U.S.C. § 1125(d)(1)(B).

[21]     These three factors are:

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to
the mark owner or any third party for financial gain without having used, or
having an intent to use, the domain name in the bona fide offering of any goods or
services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information
when applying for the registration of the domain name, the person's intentional
failure to maintain accurate contact information, or the person's prior conduct
indicating a pattern of such conduct;

. . .

(IX) the extent to which the mark incorporated in the person's domain name
registration is or is not distinctive and famous within the meaning of subsection
(c).

15 U.S.C. § 1125(d)(1)(B).

§ 1125(d)(1)(B)(V) ("[I]ntent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site [supports bad faith]."). Similarly, the evidence of Defendants' registration of "multiple domain names which [they knew were] identical or confusingly similar to marks of [AAJ] that [were] distinctive at the time of registration of such domain names" supports a bad faith intent. *Id.* § 1125(d)(1)(B)(VIII). The Court determines that this evidence creates a fact issue as to Defendants' bad faith intent. Accordingly, summary judgment on AAJ's ACPA claim is not warranted.

D.    *Monetary recovery*

  The Lanham Act provides that:

> When a violation of any right of the registrant of a mark registered in the [USPTO], a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (2006). Defendants argue that no facts support AAJ's entitlement to an accounting of their profits or actual damages.[22]

---

[22] Defendants also assert that the undisputed facts establish that AAJ is not entitled to attorney fees and costs because this is not an "exceptional case." As an initial matter, § 1117(a) does not limit an award of costs to exceptional cases. *See First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D.*, 655 F. Supp. 2d 979, 1002 (D.S.D. 2009) ("Although the Court is awarding costs . . . the Court does not find this to be an exceptional case justifying the award of attorney fees under 15 U.S.C. § 1117(a)."). Furthermore, a determination of whether this case is exceptional is premature, and the Court defers any decision on the issue of attorney fees until such time, if any, as an appropriate motion for attorney fees is filed.

   1.    *Accounting of profits*

Defendants contend that AAJ is not entitled to an accounting of profits because there is no evidence that they acted willfully.  AAJ maintains that willfulness is not required for an accounting of profits, and that if it is required, a fact issue remains as to Defendants' willfulness.

In *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994), the court stated that an accounting of profits is appropriate under § 1117(a) upon a showing of "willful, deliberate infringement or deception."  At the time *Minnesota Pet Breeders* was decided, § 1117(a) made no reference to the term "willful."  *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 n.13 (4th Cir. 2006).  Rather, the Lanham Act was amended in 1999 to allow recovery for "a willful violation under section 1125(c)."  *Id.* ("The 1999 amendment replaced the language 'or a violation under section 43(a)' with the phrase 'a violation under section 43(a), *or a willful violation under section 43(c).*'").  Some courts have interpreted the express willfulness requirement for recovery under § 1125(c) to have abrogated any previous judicially imposed willfulness requirement for recovery under § 1125(a).[23]  *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173-75 (3d Cir. 2005).  The Court need not resolve this legal issue for purposes of Defendants' motions for summary judgment because the evidence permits an inference that Defendants acted willfully.  Specifically, Defendants knew of AAJ's marks and adopted marks nearly identical to those marks.  This supports an inference that Defendants

---

[23]      There is a division in this District as to whether willfulness remains a prerequisite to an accounting of profits under § 1117(a) for violation of § 1125(a).  *Compare Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1136 (D. Minn. 2005) (holding willfulness not required for accounting of profits in § 1125(a) false advertising action), *with Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc.*, Civ. No. 03-6173, 2005 U.S. Dist. LEXIS 4176, at *21-22 (D. Minn. Mar. 15, 2005) (requiring willfulness for an accounting of profits), *and Minn. Specialty Crops*, 2002 U.S. Dist. LEXIS 13991, at *29 (same).

intended to trade off of the goodwill associated with AAJ's marks. *See W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1275 (10th Cir. 2005) ("[T]he deliberate adoption of a similar mark may lead to an inference of an intent to pass off goods as those of another." (quotation marks omitted)). Therefore, summary judgment in favor of Defendants is not warranted on AAJ's request for an accounting of profits.

       2.    *Money damages*

Finally, Defendants argue that AAJ is precluded from seeking actual damages because it has adduced no evidence that any actual damages suffered by AAJ were caused by Defendants' alleged infringing activities. A plaintiff seeking injunctive relief need establish only a likelihood of confusion. *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997); *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991). In contrast, a claim for money damages requires proof of "both actual damages and a causal link between defendant's violation and those damages." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1042 (8th Cir. 1999). This requires a showing "that the defendant's violation caused actual confusion among the consumers of the plaintiff's product and, as a result of this consumer confusion, the plaintiff suffered actual injury, such as a loss of sales, profits, or of present value." *Lenscrafters, Inc. v. Vision World*, 943 F. Supp. 1481, 1489 (D. Minn. 1996); *see also Res. Developers*, 926 F.2d at 139. As mentioned earlier, AAJ has adduced proof of actual consumer confusion. Indeed, the record contains evidence of attorneys who inadvertently sent membership dues to the Association believing it to be AAJ. Such evidence precludes summary judgment on AAJ's claim for money damages.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    AAJ's Motion for Partial Summary Judgment on Defendants' Affirmative Defense of Abandonment [Docket No. 138] is GRANTED.

2.    The Association's Motion for Summary Judgment [Docket No. 146] is DENIED.

3.    J. Keith Givens's Motion for Summary Judgment [Docket No. 153] is DENIED.

Dated:  March 18, 2010

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge